## STATE v. GARDNER.

No. 3900.   Decided March 6, 1923.   (213 Pac. 794.)

1.  CRIMINAL LAW—CONVERSATION BETWEEN DEFENDANT AND DEPUTY SHERIFF IMMEDIATELY PRECEDING SHOOTING HELD COMPETENT.   In a prosecution for the murder of a deputy sheriff while attempting to serve a writ of replevin in defendant's home, evidence

by another deputy sheriff, just before the homicide, of a conversation wherein defendant, after the sheriff had read the affidavit to him, said, "By G——, you will not take anything off this place," *held* competent as res gestæ.

2. HOMICIDE—THREAT BY DEFENDANT NINE DAYS BEFORE KILLING HELD ADMISSIBLE TO SHOW MALICE. In a prosecution for the murder of a deputy sheriff by defendant, while deceased and another deputy sheriff were attempting to serve a writ of replevin in defendant's home, evidence that defendant, in a conversation nine days before the homicide, said he would kill the plaintiff in replevin, "or any other s—— of a b——" that came on the premises to take away his or his wife's stuff, *held* admissible as showing malice, when considered in connection with a statement, after the homicide, by defendant to the person with whom the conversation was had that, "I told you I would do it."

3. HOMICIDE—STATEMENT BY DEFENDANT THAT DECEASED FORCED HIM TO SHOOT HELD ADMISSIBLE ON THE QUESTION OF ACCIDENT. In a prosecution of defendant for the murder of a deputy sheriff seeking to serve a writ of replevin in defendant's home, evidence that after the shooting defendant, in answer to a question as to why he killed deceased, replied, "He forced me to do it," *held* admissible as an answer to defendant's contention that the killing was accidental.

4. WITNESSES—QUESTION ON CROSS-EXAMINATION HELD IRRELEVANT. In a prosecution for murder of a deputy sheriff seeking to serve a writ of replevin in defendant's home, where a witness had testified that defendant said to a third person, "I told you I would do it," a question, on cross-examination, if defendant soon afterwards did not ask him whether he knew how deceased was, *held* irrelevant.

5. CRIMINAL LAW—QUESTION BY DEFENDANT AS TO CONDITION OF DECEASED AFTER HOMICIDE HELD NOT ADMISSIBLE AS RES GESTÆ. In a murder case, a question whether defendant, soon after the homicide, asked witness whether he knew how deceased was, was not permissible as showing part of the res gestæ.

Appeal from District Court, Third District, Salt Lake County; *Ephraim Hanson,* Judge.

George Gardner was convicted of murder in the first degree, and he appeals.

AFFIRMED.

*E. F. Allen,* of Salt Lake City, for appellant.

*Harvey H. Cluff,* Atty. Gen., and *W. Hal. Farr,* Asst. Atty. Gen., for the State.

THURMAN, J.

The defendant was convicted by the verdict of a jury in the district court of Salt Lake county of the crime of murder in the first degree, and sentenced to be executed as provided by law. From the judgment so entered defendant prosecutes this appeal.

There is no question raised as to the sufficiency of the evidence to sustain the verdict, nor as to the instructions given to the jury by the court. The only questions necessary to be considered relate to the admission of evidence on the part of the state, alleged to be incompetent, and the rejection of evidence on the part of defendant, alleged to be competent.

As to the essential facts of the case there is practically no dispute, except that defendant claims that the killing was accidental, while the state contends it was deliberate and intentional, with premeditated malice aforethought.

Defendant with his wife resided on a farm near the station of Welby, in Salt Lake county. Between his wife and one Joseph W. Irvine there existed a dispute concerning some farming machinery, live stock, and other chattels, which dispute had finally ripened into a suit by Irvine against Mrs. Gardner to recover possession of the chattels. On the 15th day of April, 1922, Deputy Sheriffs Frank M. Mathews, Gordon Stewart, other officers, and Irvine, went to the home of defendant for the purpose of serving a writ of replevin in the action referred to. They arrived at defendant's home about 11 o'clock in the forenoon. Mathews and Stewart went to the rear porch of the house, and defendant came out. Some conversation occurred between Mathews and defendant

which will be referred to hereinafter. The defendant invited
them into the house. Upon entering the house defendant
picked up a shotgun and fired two shots into the body of
Stewart. The two officers started to run. Stewart fell, mor-
tally wounded, about 63 feet from the rear of the house.
Such, in general, are the main features of the tragedy.

Mathews was the only witness testifying for the state as
to what occurred when the homicide was committed. He tes-
tified that he read to the defendant the affidavit in claim
and delivery, and told him what property he was there
for. Defendant said, "By God, you will not take anything
off this place." Mathews replied, "We are officers, and we
have orders from the court, and we can't do anything else."
Defendant then said, "Come on into the house; let us set-
tle it." Mathews hesitated a second, and Stewart said,
"Come on," whereupon all three of them entered the house,
defendant in advance, Stewart next, and Mathews following.
The shooting occurred immediately after they entered the
house. Mathews and Stewart both ran out of the house for
a distance of about 60 feet, when Stewart fell. Defendant
at that time was within 10 or 12 feet of Mathews, and level-
ing his gun upon him said, "Back off the place you G——d
d—— s—— of a b—— or I will kill you too." Mathews
said, "Don't shoot; I will back off." While this was going
on the other officers and Irvine were at the barn some 200
or 300 feet southwest of the house, and Mathews called to
them to get off the place. Such, in brief, are the essential
features of Mathews' testimony in chief, and it was not
modified on cross-examination.

R. W. Morgan, a witness for the state, testified that he
was a deputy sheriff of Salt Lake county; that on April 6,
1922, just nine days before the homicide, he in company
with other officers, armed with a search warrant, went to
the defendant's home in search of intoxicating liquors; that
on that occasion the defendant in speaking of his troubles
with Irvine said he would kill Irvine "or any other s——
of a b——" that came on those premises to take away any
of his or his wife's "stuff" Witness remonstrated with de-

fendant, and advised him to consult his attorney, whereupon defendant admitted that witness had given him good advice.

Morgan also testified that he was at the defendant's home the day the homicide was committed; that it was about 2 o'clock in the afternoon. Witness was in company with R. H. Giles. They saw defendant, who was then under arrest. When defendant saw witness he said: "Well, Mr. Morgan, I told you I would do it." Giles testified to the same effect,

Herbert Leichter, for the state, testified that he was chief criminal deputy sheriff of Salt Lake county; that on the day of the homicide he rode from Welby to Salt Lake City in the automobile in which defendant was riding, and heard a conversation between defendant and one Keating, a reporter of the Telegram, relative to the shooting of Gordon Stewart; that in response to a question by the reporter as to why he killed Stewart defendant said, "He forced me to do it." The same witness also testified that in response to other questions by Keating defendant admitted that Stewart did not strike him, or threaten him, or pull a gun on him, and also admitted that he was acquainted with Stewart.

The defendant was sworn as a witness in his own behalf. After testifying concerning his troubles with Irvine and the controversy between them concerning the property, all of which tended to show the tense feeling existing between them, he then testified concerning the conversation with Mr. Morgan, that he said to Morgan, "Don't let Mr. Irvine come out, because as sure as he does come out here and tries to take anything off the place that rightfully belongs to me, without a square and just settlement, they will haul him off." On further examination he also testified, "I may have said that I would kill anybody else that undertook to do so." In answer to questions relating to what occurred immediately before the homicide, defendant testified that he saw two persons approaching the door of the house; that Mr. Mathews said he and Irvine had come to take some of the stock. Defendant stated he did not know Mathews or Stewart, at that time, but he since learned who they were. In answer

to Mathews' statement that he and Irvine had come to take the stock, defendant says he replied that he would settle with Mr. Irvine. He had no gun in his hand at the time. He then turned in the doorway, and walked back through the kitchen and dining room into the bedroom. The gun was standing there. He picked it up and returned. He put his hand down to see if the safety was on as he came to the door. His finger was on the trigger, and, being excited, the gun went off. He saw nobody there, the door was not fully open, it slammed against the gun, and it went off the second time. The gun was lighter on the trigger than the average gun. Defendant said he did not see either Mathews or Stewart when he shot, and did not know that any one was hurt. He saw them running out of the kitchen. He came out of the house and ran towards the barn. As he ran to the barn some one said, "Don't shoot me!" Defendant said, "I don't want any of you gentlemen; just please leave me alone." He heard some one say, "Go help Mr. Stewart." This was the first knowledge he had that the shots had struck any one. On cross-examination defendant stated he got his gun to go after Irvine and prevent his taking the stock by killing him. He also stated that on April 6th he had told Morgan that he would kill Irvine or anybody else who came to take his property. Defendant denied using opprobrious language to Mathews and telling him to back off or he would kill him; denied making any reply to Keating, the Telegram reporter, to the questions heretofore referred to.

When the witness Giles was on the stand, after testifying that he rode in the automobile with defendant and others from the defendant's home, he was asked by defendant's counsel if the defendant did not ask him, "Do you know how Mr. Stewart is?" This was objected to by the district attorney as incompetent, and the objection sustained.

The foregoing statement of the evidence fairly reflects all that is material to the issues presented for our determination.

The first error assigned is the admission of the testimony of the witness Mathews as to the conversation be-

tween him and defendant just before the homicide. It will be remembered Mathews testified that after reading the affidavit to defendant defendant said: "By G——, you will not take anything off this place." This was only a few minutes before the shooting occurred, and was so intimately connected with the tragedy, both as to time and circumstance, as to clearly make it a part of the res gestae. Besides this, it evinced a deliberate intention on the part of defendant to use force if necessary to prevent the officers from executing the writ. The authorities cited by appellant's counsel lend no support to his contention that the testimony was incompetent, but, on the contrary, sustain the contention of the state. 21 Cyc. 929, 930, 931.

The next assignment of sufficient materiality to merit consideration relates to the testimony of the witness Morgan as to what the defendant said in the conversation of April 6th, nine days before the homicide. Defendant insists that the testimony was incompetent and immaterial. The testimony was that defendant said he would kill Irvine "or any other s—— of a b——" that came on the premises to take away his or his wife's stuff. The evidence was admissible as tending to show malice against any one who would come to take the property away. Stewart belonged to that class. As demonstrating that appellant himself so understood it, we have the further testimony of Morgan that on the day of the homicide, shortly after the tragedy, defendant said to him: "Mr. Morgan, I told you I would do it." The testimony as to this statement was likewise objected to, and the ruling thereon assigned as error. When both statements are considered, they not only tend to show malice toward the class to which Stewart belonged, and hence toward Stewart personally, but they also show premeditation and deliberate intention to kill. In support of this proposition the Attorney General calls our attention to Underhill, Crim. Ev. §§ 328, 329; 21 Cyc. 922, 923; 2 Wharton, Crim. Ev. §§ 756, 882.

Defendant also assigns as error the admission of the testimony of the witness Leichter, who testified, among other

things, that in answer to a question as to why he killed Stewart defendant replied, "He forced me to do it." This was certainly admissible as a complete answer to defendant's contention that the killing was accidental.

The witness Giles testified that while on the premises of defendant he heard defendant say to the witness Morgan, "Mr. Morgan I told you I would do it." Defendant's counsel, on cross-examination, asked Giles if defendant, while riding in the car soon afterwards, did not asked him the following question: "Do you know how Mr. Stewart is?" The district attorney objected to the question as improper cross-examination and as irrelevant and immaterial. The objection was sustained. This also is assigned as error.

It is difficult to understand upon what theory it can be contended that the question was either proper cross-examination, relevant, or material. The question had no relation whatever to anything about which the witness testified in chief. It related to a different time and place, and to a conversation in which the witness was not a party. His testimony in chief related to what defendant said to Morgan before they left defendant's premises. The question to which the district attorney objected related to what was said after they left the premises and while riding in the car.

Defendant's counsel insists that the question was admissible, not only on the grounds that it was a part of the conversation which occurred upon the premises, but also that it was part of the res gestæ. We have already disposed of the first contention. Was it admissible as part of the res gestæ? If the statement made by defendant to Morgan while they were on the defendant's premises was not part of the res gestæ as contended by counsel for appellant, it is difficult to see how the question asked by defendant after they left the premises was part of the res gestæ. It would be carrying the doctrine of res gestæ entirely too far to hold that what defendant said to Giles in the car, after leaving the premises and after other circumstances and con-

versations had intervened, was a part of the res gestæ and admissible as evidence. No authority has been cited in support of such contention, and we seriously doubt if any can be found.

We have now carefully examined and briefly reviewed every objection raised by appellant which in our judgment merits consideration, and we find no error in the record. If this were not a case in which the life of a human being is at stake the writer would feel it his duty to apologize for having occupied more space than the actual merits of the case demand.

The killing of Gordon Stewart, an inoffensive officer in the faithful discharge of his duty, appears to have been as unprovoked, malicious, deliberate, and premeditated as any homicide heretofore recorded in the criminal annals of the state. The defendant's pretense that the killing was accidental which was his only defense, is conclusively controverted by the fact that he never made any such claim on the day when the homicide was committed, but, on the contrary, when asked why he did it, his answer was, "He forced me to do it." This pretended excuse is without a scintilla of evidence to support it, even if we include the testimony of defendant himself.

It follows from the foregoing review of the case that the appeal is without merit.

For the reasons stated, the judgment of the trial court is affirmed.

WEBER, C. J., and GIDEON, FRICK, and CHERRY, JJ., concur.