# STATE v. GARDNER.

No. 3950.   Decided July 28, 1923.   (217 Pac. 1111.)

1. CRIMINAL LAW—STATUTE AUTHORIZES DISCHARGE OF JURY WHEN NO PROBABILITY OF AGREEMENT EXISTS; SUCH DISCHARGE IS NOT BAR TO ANOTHER TRIAL. When a jury in a criminal case reports that an agreement cannot be reached, their discharge is within the sound discretion of the court, whose action will not be interfered with unless an abuse of discretion is alleged and shown (Comp. Laws 1917, § 9014); nor is such discharge a bar to another trial.

2. CRIMINAL LAW—REFUSAL TO SUBMIT PLEA OF FORMER JEOPARDY HELD PROPER. Where the trial court accepted the reported disagreement of the jury as satisfactory evidence that no verdict could or would be returned, the plea of former jeopardy was without support in the evidence, so that the court's action in treating the issue as one of law and refusing to submit the plea was proper.

3. CRIMINAL LAW—DEFINITE SENTENCE INSTEAD OF INDETERMINATE ONE HELD NOT VOID, THOUGH ERRONEOUS. In a manslaughter prosecution, sentence of defendant to an absolute term of 10 years, instead of to an indeterminate term, though erroneous, *held* not invalid in view of Comp. Laws 1917, § 9063, providing that, if a defendant is erroneously sentenced for a definite period, such sentence shall, nevertheless, be for an indeterminate period.

4. HOMICIDE—DYING DECLARATIONS TO BE ADMISSIBLE MUST RELATE TO CIRCUMSTANCES OF KILLING. Dying declarations are not admissible in evidence unless they relate to the facts connected with the declarant's death, and they must be restricted to the act of killing and the circumstances surrounding the homicide.

5. HOMICIDE—ERRONEOUS ADMISSION OF DYING DECLARATION NECESSITATES REVERSAL ONLY IF ADMISSION WAS PREJUDICIAL. Though a dying declaration is erroneously admitted in evidence, it will not call for reversal unless it was clearly prejudicial to defendant.[1]

6. HOMICIDE—ADMISSION OF DYING STATEMENT HELD ERRONEOUS AND PREJUDICIAL. In a homicide prosecution, admission of

---

[1] *State* v. *Siddoway*, 61 Utah, 189, 211 Pac. 968; *State* v. *Nell*, 59 Utah, 68, 202 Pac. 7; *State* v. *Cluff*, 48 Utah, 102, 158 Pac. 701.

dying statement of deceased, "Watch Marth, she has sworn to kill me," *held* erroneous and prejudicial to accused, in that it weakened, if not destroyed, her explanation of her conduct in justification of her actions.

Appeal from District Court, Third District, Salt Lake County; *Ephraim Hanson,* Judge.

Martha Gardner was convicted of manslaughter, and appeals.

REVERSED and new trial granted.

*J. E. Darmer,* of Salt Lake City, for appellant.

*Harvey H. Cluff,* Atty. Gen., and *W. Hal Farr,* Asst. Atty. Gen., for the State.

WEBER, C. J.

The defendant was charged jointly with one George Gardner with the murder of Joseph Irvine. She demanded and was given a separate trial, which resulted in a disagreement of the jury. She was tried a second time, found guilty of manslaughter, and appeals.

At the second trial defendant, in addition to the plea of not guilty, interposed a plea of former jeopardy; the plea alleging that she had theretofore been tried on the same charge, that a jury had been impaneled and sworn, that testimony had been produced by the state and the defense, that the cause was submitted to the jury for its consideration and after a consideration thereof, by it for 28 hours said jury was discharged, that it did not appear probable that the jury could not agree upon a verdict, and "that the judge did not require the jury to consider the matter for a reasonable time, but without sufficient cause excused and discharged it from further consideration of its verdict."

The record shows that at the first trial the cause was submitted to the jury, and about 28 hours after the submis-

sion the jurors returned into court with the statement that an agreement could not be reached; whereupon they were discharged.

When a jury in a criminal case reports that an agreement cannot be reached, their discharge is within the sound discretion of the court, whose action will not be interfered with unless an abuse of discretion is alleged and shown.          1 The statute expressly authorizes the discharge of a jury when it satisfactorily appears to the court that there is no reasonable probability that they can agree. Comp. Laws Utah 1917, § 9014.

"It is now generally held that the discharge of the jury, where after full consideration they fail to agree, and there is no reasonable expectation that they will be able to agree, is not a bar to another trial, on the ground that such a condition of affairs constitutes absolute and urgent necessity, and justified the court in discharging the jury." 16 C. J. p. 245, § 408.

The reported disagreement of the jury was accepted by the trial court as satisfactory evidence that no verdict could or would be returned by the jury. With that record before the court the plea of former jeopardy was without          2 out any basis or support whatever in the evidence. The submission of the plea to the jury would have been farcical. The trial court was right in treating the issue as one of law and in refusing to submit it to the jury.

An assignment of error relates to the judgment, the court having sentenced defendant to an absolute term of 10 years instead of to an indeterminate term of imprisonment. While erroneous, the judgment is not invalid. Comp. Laws Utah 1917, § 9063, provides that "if, through mistake or otherwise, any person shall be sentenced for a definite period of time for any offense other than treason or          3 murder in any of the degrees thereof, such sentence shall not be void, but the prisoner shall be deemed to be sentenced, nevertheless," to an indeterminate period.

Defendant's counsel made numerous requests for instructions to the jury. Those to which she was entitled were given either as requested or in substance. The instructions were fair and clear and contain no reversible error.

There are 54 assignments of error. The only meritorious assignment is that a dying statement of Joseph Irvine was erroneously admitted in evidence.

Irvine was shot by George Gardner on April 15, 1922, and died from his wounds two days later. On the morning of the day of Irvine's death, Albert Sterling, a relative of the deceased, visited Mr. Irvine at the hospital and had a conversation with him. Mr. Sterling and Mrs. Irvine testified that when they told Mr. Irvine that he would be all right he pointed to the wound in his neck and shook his head. Mr. Sterling gave Irvine a piece of paper on which he wrote, "Watch Marth, she has sworn to kill me." "Marth" referred to Martha Gardner, the defendant.

It is argued that this written statement was not admissible because the foundation was insufficient.

The evidence shows that the deceased realized that death was impending at the time he made the declaration. While a sufficient foundation was laid, the statement, nevertheless, was inadmissible. Dying declarations are not admissible in evidence unless they relate to the facts connected with the declarant's death. They must be restricted to the act of killing and the circumstances surrounding the homicide. Thus, declarations made by a deceased that the accused had attempted two or three times previously to kill him are not admissible, or where they show old threats on the part of the accused toward the deceased. Wharton's Crim. Ev. (10th Ed.) § 278, p. 545. To this effect are all the authorities. 30 C. J. § 514, p. 277; 1 R. C. L. § 78, p. 535.

The admission of Irvine's statement written while on his deathbed was unquestionably erroneous. But was the error clearly harmful and clearly prejudicial to defendant? If not, it does not call for reversal. *State* v. *Siddoway,* 61 Utah, 189, 211 Pac. 968; *State* v. *Nell,* 59 Utah, 68, 202 Pac. 7; *State* v. *Cluff,* 48 Utah, 102, 158 Pac. 701. To answer this question it becomes necessary to refer to the evidence.

On the morning of April 15, 1922, Joseph W. Irvine and several deputy sheriffs went to the ranch where defendant

was living with George Gardner at Welby in Salt Lake county. They went to serve a writ of replevin in an action in which Joseph W. Irvine was plaintiff and Martha Gardner was defendant. Upon their arrival at the house the defendant came out to meet them. The officers proceeded to the barn to secure the items mentioned in the writ of replevin. They were followed into the barn by the defendant. One of the officers took her out of the barn, and as they came out they heard the report of a gun and saw Deputies Matthews and Stuart running out of the rear door of the house; George Gardner following them with a gun in his hand. Stuart fell mortally wounded, whereupon defendant, Martha Gardner, exclaimed: 'My God! He has killed an innocent man. Don't kill any more innocent men. Go get Irvine.'' In the meantime George Gardner ordered the other men off the place, threatening to kill them if they did not go. They started to back off the place. At this time Deputy Sheriff Matthews called to Irvine, who had come out of the barn and was standing just outside, and said, ''Get off the place or he will kill you.'' Irvine started to run up a small ravine which runs south and west of the barn. George Gardner then proceeded toward the barn, keeping the officers covered with his gun. The defendant, Martha Gardner, preceded him to the barn, and upon his arrival, she came out with a horse. Gardner mounted the horse, and, while in the act of mounting, he handed the gun to the defendant, which she held until he had mounted; and then, according to one of the witnesses for the state, she returned the gun to him, saying as she did so: ''Get Irvine. He is the man you want. He has gone up the creek.'' Gardner then disappeared on horseback in the direction Irvine had taken. He returned to the home in a short time and later the officers found Irvine in the ravine mortally wounded.

George Gardner was tried for the murder of Deputy Stuart and convicted. *State* v. *Gardner,* 61 Utah 359, 213 Pac. 794.

The defendant testified on her own behalf, stating that after Gardner went into the house she asked the officers not to go in, but to take the things that were mentioned in the writ of replevin, but that instead of so doing two of the

officers went into the house and in a moment there was a shot. Her testimony from this point on, as abstracted by her counsel, was:

"I screamed. Saw them run out of the barn. Saw Matthews running over to us. He says, 'Tell Joe to get off the place,' and there was some yelling telling Joe to go, and they ran down to the barn. Saw Mr. Irvine run down a well-defined path. He was soon out of sight. Ran down in the gully. I saw Gordon Stuart come out of the house and fall. * * * Mr. Matthews and myself ran over to the body. * * * In a second or two George Gardner made his appearance. * * * We looked up and saw George Gardner about 20 feet from us with the gun pointed right at all of us. * * * He was saying to back off the place or he would shoot. He didn't shoot because I screamed at him. As he raised the gun I shrieked. I said, 'Don't shoot another man—go get Irvine.' Previous to that I had seen Irvine run. He had run down the hollow which was a place of absolute safety. I believed at that time that if I didn't distract the attention of George Gardner he would have shot me and Matthews and Herringer. * * * Matthews said not to shoot; that he would get off the place. * * * Then Don Gardner (another deputy sheriff) came, and Gardner said the same to him and pointed the gun at him. * * * Mr. Gardner was close to us crossing toward the barn. * * * He called for a horse while he still had the gun pointed at us. He seemed to address that remark to me. I believed that if I didn't get the horse for him he would shoot me. I hesitated, and the officers stood there seemingly dazed, and he again called for the horse, and I obeyed the command. I went into the barn, untied the horse, and brought it out. George Gardner took it, and I went and got the bridle as he told me to. Not a word was exchanged. He indicated to me to get the bridle. * * * He raised the gun right along side of the horse. He says, 'Hold the gun.' * * * I turned around for about a second and just closed my eyes. I was so excited then I didn't see. * * * Didn't say a word. * * * I did not tell him when standing there to go get Irvine. Did not say a word. Did not know which way Irvine had gone, hadn't the slightest idea."

On cross-examination the defendant said that she obeyed the command because of fear of Gardner; that when she told Gardner to get Irvine, she knew it would distract the man's attention; that she "felt like that would save the officers' lives and my life." She further said:

"I had seen Irvine run, and he could have been down to Welby or Midvale from the time that George Gardner went over toward

him. I knew that he had gone to a place of safety, no matter whether he went up or down the creek. * * * I was trying to distract the insane man's attention from them, and the name of Joseph W. Irvine was in my mind at that particular time."

It is argued that threats by Mrs. Gardner to kill Irvine were shown by evidence other than that of Irvine's dying statement. During a verbal altercation with Irvine, when he first appeared at the Gardner place on the day of the tragedy, Irvine threatened to slap defendant, and she replied that, "If I had a gun, I would kill you." At another time she said to Irvine, "You deserve to be shot," and again, "Joe pulled a gun on Irvine, and it is too bad he didn't kill him." She also expressed the hope that Gardner would shoot him. None of this evidence could have had an effect on the minds of the jurors comparable with that of Irvine's dying statement, which was in effect that a direct and deliberate threat had been made by Martha Gardner to kill Irvine. The statements to which witnesses for the state testified indicated her state of mind rather than a deliberate intent to kill Irvine.

The solemn statement of the dying Irvine, "Watch Marth, she has sworn to kill me," was convincing testimony. It materially strengthened the prosecution. It weakened, if it did not in the opinion of the jury entirely destroy, the testimony of the defendant in explanation of her conduct and in justification of her actions. Its admission was erroneous, and its effect harmful and prejudicial to the substantial rights of the defendant to such an extent that she was not accorded the fair trial to which she was entitled.

Judgment reversed, and a new trial granted.

GIDEON, THURMAN, and CHERRY, JJ., concur.

FRICK, J., did not participate herein.